# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00738-CV

**Appellants, Phillip Wilson and Laura Wilson // Cross-Appellant, Neoma Whetstone**

**v.**

**Appellee, Neoma Whetstone // Cross-Appellees, Phillip Wilson and Laura Wilson**

### FROM THE DISTRICT COURT OF HAYS COUNTY, 274TH JUDICIAL DISTRICT
### NO. 04-1276, HONORABLE GARY L. STEEL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

These cross-appeals following a jury trial arise from the competing claims of adjacent landowners to an area of land where their two tracts adjoin along Onion Creek in Hays County (the "disputed area"). The district court granted a directed verdict that Phillip and Laura Wilson (the "Wilsons") held record title to the disputed area and submitted to the jury, among other issues, whether Neoma Whetstone had adversely possessed the area. The jury found in Whetstone's favor, and the district court entered judgment in accordance with the jury's findings, declaring that Whetstone recover title and possession to the disputed area and declaring the boundary line between the parties' tracts of land. The district court denied both parties' requests for attorney's fees but conditionally granted the Wilsons' request for attorney's fees in the event that the Wilsons successfully appealed the jury's adverse possession findings. The district court also awarded the Wilsons $8,609.80 for half the cost of a survey that they incurred during the litigation.

In three issues, the Wilsons contend that the district court erred in its instructions to the jury concerning adverse possession and challenge the legal and factual sufficiency of the evidence to support the jury's findings and essential elements of adverse possession. On cross appeal, Whetstone challenges the district court's award of survey costs to the Wilsons and the district court's denial of her request for attorney's fees pursuant to the Uniform Declaratory Judgments Act. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 2008) (the "Act"). For the reasons that follow, we modify the judgment to delete the award of survey costs to the Wilsons and affirm the judgment as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Controversy*

The two adjoining tracts of land owned by the Wilsons and Whetstone originated from a larger tract owned by George and Helena Luersen. In 1917, the Luersens divided their land, conveying the adjoining tracts to their sons Otto and Fritz. Otto Luersen's land, to the east, formed the basis of Whetstone's chain of title, and Fritz Luersen's land, to the west, formed the basis of the Wilsons' chain of title. The common boundary line as described in the deeds from the Luersens to their sons provided both tracts of land access to Onion Creek.

Beginning in the 1940s, deeds that were recorded in the real property records in both the Wilsons' and Whetstone's chains of title describe the boundary line between the two tracts with reference to a fence along the "west bank of Onion Creek."[1] The fence on the west bank of Onion

---

[1] A deed, dated in 1924 and recorded in 1943, conveyed an area in the shape of a triangle (the "triangle area") primarily on the east side of Onion Creek from the tract of land on the Wilsons'

2

Creek (the "fence") had been in existence and in the same approximate location from at least the 1940s. The disputed area is to the east of the fence, and the Wilsons do not have access to Onion Creek without it.

Whetstone and her husband purchased their tract of approximately 85 acres in 1957. Consistent with the deeds on both parties' chains of title from the 1940s, the legal description in their deed included the disputed area as part of their tract of land and identified the boundary line between their tract and the tract now owned by the Wilsons by referencing the fence along the west bank of Onion Creek.[2]

The Wilsons purchased their tract of approximately 28.32 acres from Howard and Bertha Nations in 2002. The deed from the Nations to the Wilsons referenced the Whetstones' 1957 deed and, similar to the Whetstones' deed, identified the boundary line between the two tracts as "fenced" along the "west bank of Onion Creek." The Wilsons' tract of land, as described in the deed, did not include the disputed area, but the Wilsons obtained a correction deed without warranty in 2004 that described their tract to include the disputed area. The Wilsons installed a gate in the fence that enabled them to access Onion Creek and began cutting down trees and clearing brush in the disputed area.

_____

side to the tract of land on Whetstone's side. The conveyance of the triangle area is not in dispute; the parties agree that it is part of Whetstone's tract.

[2] Whetstone's husband died in 1995. Whetstone was the sole owner of the property during the relevant time period.

***Litigation Commenced***

Whetstone brought suit in 2004 seeking declarations concerning her ownership of the disputed area and the proper boundary line. She contended alternatively that (i) she had adversely possessed the disputed area, (ii) she had superior title from a common source, and/or (iii) Whetstone, the Wilsons, and their predecessors in interest acquiesced and recognized the legal boundary line between the tracts as running with the fence. She also sought her attorney's fees and costs, including survey costs.

The Wilsons counterclaimed for a declaratory judgment that they were the record title owners of the disputed area and that the boundary line between their tract and Whetstone's tract was as originally conveyed in the 1917 deed from the Luersens to their sons combined with the conveyance in 1924 of the triangle area. The Wilsons also sought their attorney's fees and costs, including survey costs.

During the pendency of the case, the Wilsons hired Metcalf & Sanders to survey and plot the relevant deeds' descriptions of the boundary line between the two tracts. Metcalf & Sanders plotted the boundary line as described in the 1917 deeds conveying the two tracts from the Luersens to their sons, the 1924 deed conveying the triangle area, the Whetstones' 1957 deed, the 2002 deed from the Nations to the Wilsons, and the 2004 correction deed. The survey plots the description of the boundary line in the Whetstones' deed somewhat to the west of the fence line.

In January 2008, the parties appeared before the court for a hearing regarding legal title to the disputed area. Following the hearing, the district court found as a matter of law that (i) the common owner of the two tracts was George and Helena Luersen, (ii) they divided their

4

property between their sons, Otto and Fritz, in 1917, (iii) the boundary line between the two tracts "is accurately established and set out in the Map of Survey performed by Metcalf & Sanders," and (iv) the disputed area was included in the conveyance to Fritz Luersen and "there has been no written conveyance or transfer of that disputed portion of land from the side of Fritz Luersen or his successors in title to the side of Otto Luersen or his successors in title."

### *The Trial*

The jury trial occurred in June 2008. The disputed issues included whether the parties and their predecessors in interest acquiesced to the boundary line following the fence line and whether Whetstone had adversely possessed the disputed area.

Witnesses to testify on behalf of Whetstone included Whetstone, a nephew of Whetstone, a nephew of Otto Luersen, and a title expert. Whetstone testified concerning her understanding that the fence line on the west bank of Onion Creek was the boundary line between the two tracts of land. She testified to her and her husband's purchase of their tract of land as a ranch, including the disputed area, and their payment of taxes on their tract, including the disputed area, from 1957 forward. She testified that the fence was there when she and her husband purchased their land; that they used the disputed area in the same manner that they used the rest of their ranch, including for recreation and continuously grazing livestock; that they maintained and replaced the fence, including installing livestock proof netting and fence posts and improving the "water gap" in the fence; and that they cleared the creek bed in the disputed area.

Whetstone also testified to an incident with Howard Nations, one of the former owners of the tract now owned by the Wilsons. Nations diverted water from Onion Creek to form a pond on

5

his land. Whetstone testified that Nations's actions to divert water from the creek were on his side of the fence and that she and her husband decided not to take action against him.[3] She also testified that prior neighbors before the Wilsons did not use the disputed area, and that the first time that there was a gate providing access to Onion Creek from the Wilsons' side was when the Wilsons modified the fence to add a gate.

The nephew of Otto Luersen testified to his observations of the fence and the disputed area in the 1930s when Otto Luersen and his wife owned Whetstone's tract of land. He testified that, when he was swimming in Onion Creek in the area in dispute, "I assumed I was on my aunt and uncle's property." Whetstone's nephew testified to the Whetstones' uses of their ranch, including the disputed area, and his belief that his aunt and uncle owned the disputed area. He testified that he started visiting his aunt and uncle at their ranch "in about 1958" and continued visiting them every year, including spending summers with them "follow[ing] my uncle around and do[ing] what he did."

---

[3] Whetstone testified:

Q.    Did Mr. Nations ever come onto your property in connection with building that pond or lake?

A.    No. He just came to the fence.

Q.    Is there anything that you could have done to have stopped him from digging that hole in the ground?

A.    I don't know whether there is anything we could have done or not. We didn't.

Q.    It was all on his side of the property?

A.    It was all on his side of the fence.

6

He testified that he did not see anyone else use the disputed area, that he assisted his uncle with repairing and maintaining the fence before his uncle died, and that he continued to assist his aunt with needed repairs, including "mending" the fence, after his uncle died. The title expert testified concerning the deeds in both sides' chains of title. He opined that Whetstone owned the disputed area because "[t]here was an agreement back in [19]42 that [the parties on both sides] would recognize the fence on the west bank as the boundary line between the two parcels."[4]

The Wilsons testified on their own behalf. They testified that, when they purchased their tract of land, they understood the boundary line to be a rock wall on the east side of Onion Creek and that their tract included the disputed area. Mrs. Wilson testified that they began paying taxes on the disputed area in 2006, and Mr. Wilson testified that the disputed area was important because the Wilsons do not have access to Onion Creek or to another water source without it. The Wilsons also called George Sanders, a registered surveyor of Metcalf & Sanders, and Kathryn Wehrmann who signed the correction deed. Wehrmann testified concerning the circumstances surrounding the correction deed and her visits to the Wilsons' tract when it was owned by Wehrmann's mother-in-law. Wehrmann testified that she used the disputed area when she visited and believed that it belonged to her mother-in-law. Her mother-in-law died in 1973, and the property was sold shortly after her death to the Nations. Sanders testified as an expert for the Wilsons concerning the survey work that Metcalf & Sanders undertook to plot the approximate locations of the boundary lines as described in the

---

[4] His opinion was based in part on an affidavit that was signed by Otto Luersen and others and recorded in the real property records in 1942 describing boundaries of land in Hays County.

relevant deeds in both chains of titles. The survey was admitted into evidence as well as excerpts from two other surveys prepared in 1974 and 1977.

The district court granted a directed verdict in favor of the Wilsons and instructed the jury that the Wilsons had record title to the disputed area. The Wilsons also moved for directed verdict on Whetstone's adverse possession and acquiescence claims, but the district court denied those motions. The district court submitted questions to the jury concerning adverse possession and acquiescence to the boundary line and attached and referenced excerpts of the survey prepared by Metcalf & Sanders—Exhibits A and B—to the jury charge. Exhibit B depicts the disputed area on the survey by highlighting it. Neither party objected to the depiction of the disputed area in Exhibit B.

The jury found in favor of the Wilsons that the owners on both sides of the disputed area did not acquiesce to the boundary line as proposed by Whetstone.[5] The jury, however, found in favor of Whetstone on the four adverse possession questions. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 16.025 (five-year limitations period), 16.026 (ten-year limitations period), 16.027 (twenty-five year limitations period), 16.028 (twenty-five year limitations period with recorded instrument) (West 2002). The district court entered judgment in accordance with the jury's verdict. The district court

---

[5] The jury found that, during the period October 1942 to February 1943, there was "uncertainty, doubt or dispute between the owners on both sides of the property in question over the true boundary line" but that the owners did not agree or acquiesce that the boundary line was the "approximate location of Whetstone deed line." The jury question identified the boundary line by referring to the "boundary line highlighted in Attached Exhibit A." Whetstone has not appealed the jury's findings on acquiescence. *See Moore v. Stone*, 255 S.W.3d 284, 291 (Tex. App.—Waco 2008, pet. denied) (person claiming that common boundary line "established by acquiescence must show that he has title to the tract and that the owners of the property on both sides of the line agreed to, acquiesced in, or recognized such line as the boundary" and "boundary-by-acquiescence . . . must stem from some initial uncertainty or dispute over the true boundary line").

8

declared that Whetstone recover from the Wilsons the title and possession of the disputed area and declared the boundary line between the two tracts. The district court referenced and incorporated the description of the disputed area in Exhibit B in the court's charge to the jury. The district court denied both parties' requests for attorney's fees but awarded the Wilsons one-half of their survey costs and conditionally granted their request for attorney's fees in the event that this Court overturns the jury's findings on adverse possession. These cross appeals followed.

## ANALYSIS

In three issues, the Wilsons challenge the legal and factual sufficiency of the evidence to support the essential elements and the jury's findings of adverse possession and contend that the trial court erred in overruling the Wilsons' objections to the instructions and denying the Wilsons' requested instructions for the adverse possession questions. On cross-appeal, Whetstone challenges the award of one-half of the Wilsons' survey costs and the district court's denial of her request for attorney's fees.

### *Adverse Possession*

The Wilsons challenge the legal and factual sufficiency of the evidence to support adverse possession. They contend that the district court erred in denying their motion for directed verdict and submitting the adverse possession questions to the jury because Whetstone failed to establish essential elements of a claim for adverse possession under any of the adverse possession statutes at issue. The Wilsons contend that adverse possession "cannot happen accidently or inadvertently" and that there was no evidence for the requisite time period that (i) Whetstone intended

9

to appropriate or claim her neighbor's property, (ii) her claimed acts amounted to actual and visible appropriation, (iii) there was hostile use of the disputed area, or (iv) her use was exclusive. They also contend that the district court erred in its instructions to the jury concerning the challenged elements of adverse possession.

### 1.     *Jury Instructions on Adverse Possession*

As a preliminary matter, Whetstone contends that the Wilsons did not preserve their complaints concerning the jury instructions on adverse possession. But the Wilsons raised their objections with the district court, submitted their proposed instructions in writing, and the district court refused the instructions in writing. *See* Tex. R. Civ. P. 278. We turn then to the Wilsons' complaints concerning the jury instructions.

We review a trial court's decision to submit or refuse a particular instruction to the jury under an abuse of discretion standard of review. *Id.*; *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). "The trial court has considerable discretion to determine necessary and proper jury instructions." *In re V.L.K.*, 24 S.W.3d at 341. "When a trial court refuses to submit a requested instruction on an issue raised by the pleadings and evidence, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict." *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (citation omitted); *see also* Tex. R. Civ. P. 277, 278. Error in the omission of an instruction is reversible only if the omission "probably caused the rendition of an improper judgment." Tex. R. App. P. 44.1(a); *Shupe*, 192 S.W.3d at 579; *Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 757 (Tex. 2006).

10

The Wilsons contend that the district court erred by refusing to submit the following instructions with the adverse possession questions to the jury:

- Sporadic, irregular or occasional use of land does not support a claim for adverse possession.

- Exclusive possession means an exclusive dominion over the land and an appropriation of it to the claimant's use and benefit.

- Visible appropriation must be of such character as to indicate unmistakably an assertion of a claim of exclusive ownership in the occupant.

The jury was instructed concerning the adverse possession questions as follows:

"Adverse Possession" means an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person.

"Hostile" means the acts performed on the land were of such nature and character as to reasonably notify the true owner of the land that a hostile claim was being asserted to the property. Hostile use does not require an intention to dispossess the rightful owner, or even know that there is one. There must be an intention to claim the property as one's own to the exclusion of all others; however mere occupancy of land without intention to appropriate is not hostile.

"Peaceable Possession" means possession of real property that is continuous and is not interrupted by an adverse suit to recover the property.

A person claiming title to property by adverse possession must show that the possession is not only actual, but also visible, continuous, notorious, distinct, hostile and of such a character as to indicate unmistakably an assertion of a claim of exclusive ownership of the occupant.

One of the ways actual and visible appropriation can be established is by a designedly enclosed fence, but not by a casual fence. Where a fence existed prior to the claimant's possession of the land and the claimant fails to demonstrate the purpose for which the fence was erected, the fence is a casual fence. Repairing or maintaining a

11

casual fence, even for the express purpose of keeping the claimant's animals within the enclosed area does not change a casual fence into a designed enclosure.

The district court's instructions defining "adverse possession" and "peaceable possession" track the statutory definitions. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 16.021(1), (3) (West 2002); *see Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (no abuse of discretion in charge that tracked statutory language in the instruction and then asked controlling question); *Doll v. Hurst*, No. 03-02-00576-CV, 2003 Tex. App. LEXIS 6921, at *20-22 (Tex. App.—Austin, Aug. 14, 2003, pet. denied) (mem. op.) (trial court did not abuse discretion with instruction that "followed the language of [adverse possession] statutes precisely"). And the instructions correctly state the law of adverse possession, including the elements of actual and visible appropriation, exclusivity, and hostile use. *See Tran v. Macha*, 213 S.W.3d 913, 914-15 (Tex. 2006) (discussion of elements of adverse possession, citing and quoting Tex. Civ. Prac. & Rem. Code Ann. § 16.021(1); *Rhodes v. Cahill*, 802 S.W.2d 643, 645 (Tex. 1990); *Ellis v. Jansing*, 620 S.W.2d 569, 571 (Tex. 1981); *Calfee v. Duke*, 544 S.W.2d 640, 642 (Tex. 1976)); *see also Natural Gas Pipeline Co. v. Pool*, 124 S.W.3d 188, 193, 198 (Tex. 2003).

Further, the instructions given to the jury include the substance of the Wilsons' proposed instructions. The district court addressed the elements of exclusivity, visible appropriation, and continuous use by instructing the jury that there must be an intent to claim the property to the "exclusion of all others" and that the possession had to be "visible, continuous, distinct, hostile, and of such a character as to indicate unmistakably an assertion of a claim of exclusive ownership of the occupant." We conclude that the Wilsons' proposed instructions were not "reasonably necessary to

12

enable the jury to render a proper verdict" and that the district court did not abuse its discretion in instructing the jury or refusing the Wilsons' instructions concerning adverse possession. *See Shupe*, 192 S.W.3d at 579-80; *Texas Dep't of Human Servs.*, 802 S.W.2d at 649; *see also* Tex. R. Civ. P. 277. We overrule the Wilsons' third issue.

### 2. Sufficiency of the Evidence

In their first and second issues, the Wilsons contend that the district court erred in denying their directed verdict on adverse possession because Whetstone failed to present sufficient evidence of actual and visible appropriation, hostile use, and exclusive use. On the same basis, they challenge the legal and factual sufficiency of the evidence to support the jury's findings of adverse possession.

A legal sufficiency challenge may be sustained when the record discloses one of the following: (i) a complete absence of evidence of a vital fact; (ii) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (iii) the evidence offered to prove a vital fact is no more than a mere scintilla; or (iv) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In determining whether a finding is supported by legally sufficient evidence, we view the evidence in the light most favorable to the finding, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id*. at 807. We indulge every reasonable inference that would support the finding. *Id*. at 822.

When considering a factual sufficiency challenge, we consider all of the evidence and "should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as

13

to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Moreover, it is within the province of the jury to resolve conflicts in the evidence. *See City of Keller*, 168 S.W.3d at 819-20; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (jury remains sole judge of witnesses' credibility and weight to be given their testimony); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (jury can choose to believe one witness over other witnesses or resolve inconsistencies in their testimony).

As the district court instructed the jury, adverse possession means an "actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and hostile to the claim of another person." *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.021(1). Possession must be "actual, but also visible, continuous, notorious, distinct, hostile (i.e. adverse), and of such a character as to indicate unmistakably an assertion of a claim of exclusive ownership in the occupant." *Rhodes*, 802 S.W.2d at 645; *see Harlow v. Giles*, 132 S.W.3d 641, 646 (Tex. App.—Eastland 2004, pet. denied). The question of adverse possession is a fact question. *Bywaters v. Gannon*, 686 S.W.2d 593, 595 (Tex. 1985); *Harlow*, 132 S.W.3d at 647. And Whetstone had the burden of pleading and proving each of the elements of her adverse possession claim. *See Rhodes*, 802 S.W.2d at 645.

Because any one of the four jury findings of adverse possession supports the challenged elements and the district court's finding of adverse possession, we limit our review of the evidence to support question 6.[6] *See* Tex. R. App. P. 47.1. Question 6 asked the jury:

---

[6] Question 6 tracked section 16.028 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.028 (West 2002). Section 16.028 provides in relevant part:

Do you find from a preponderance of the evidence that Mrs. Whetstone, or those under whom she claims, have held peaceable and adverse possession, of the land highlighted and identified in Exhibit B,[7] in good faith under a deed or other instrument purporting to convey and include the property that is recorded in the deed records of Hays County, Texas for any period of twenty-five (25) consecutive years prior to August 13, 2004?

Viewing the evidence in the light most favorable to the jury's finding, there was evidence that:

- The Whetstones purchased their tract of land in 1957 and the legal description in their deed included the disputed area and referenced the fence.

- The Whetstones paid taxes on their tract of land, including the disputed area, from 1957 forward.

- There was no gate access in the fence, that had been in the same approximate location from the 1940s at least, until the Wilsons added the fence after they purchased their tract of land.

---

(a)     A person, regardless of whether the person is or has been under a legal disability, may not maintain an action for the recovery of real property held for 25 years before the commencement of the action in peaceable and adverse possession by another who holds the property in good faith and under a deed or other instrument purporting to convey the property that is recorded in the deed records of the county where any part of the real property is located.

(b)     Adverse possession of any part of the real property held under a recorded deed or other recorded instrument that purports to convey the property extends to and includes all of the property described in the instrument, even though the instrument is void on its face or in fact.

*See id.* Questions 3 through 5 tracked the statutory language in sections 16.025 through 16.027. *Id.* §§ 16.025-16.027 (West 2002). The jury also answered those questions affirmatively.

[7] As previously stated, Exhibit B was an excerpt from the survey with the disputed area highlighted.

- The Whetstones treated the fence as the boundary line between the two tracts and deeds on both sides' chains of title support that the Whetstones owned the disputed area from 1957 forward.

- The Whetstones told Mr. Nations, a prior owner in the Wilsons' chain of title, that they owned the disputed area.

- The Whetstones treated the disputed area in the same manner as the rest of their ranch, including using it for recreation; replacing, repairing, and maintaining the fence; clearing the creek bed; and continuously grazing livestock in the disputed area.

- The Whetstones used the disputed area exclusively after they purchased their tract of land.[8]

This evidence supports that the Whetstones actually and visibly appropriated the disputed area, that their claim was hostile, and their use exclusive. *See Rhodes*, 802 S.W.2d at 645; *Harlow*, 132 S.W.3d at 646. The Wilsons do not contend that the Whetstones acted in bad faith at any time, and it was

---

[8] Whetstone testified:

Q. In terms of the use of the property there, Ms. Whetstone, is it true that it used to be for the neighbors to swim and fish in that creek?

A. Not after we owned it.

Her nephew also testified that he had not seen anyone using the disputed area:

Q. Prior to 2002 had you ever seen anyone, other than Mr. and Mrs. Whetstone and your family, using this area of the creek?

A. Oh, anyone other than family? No. No. In fact, that's fairly close to the house. Had there been any other people there, there would have been a lot of noise and I know my uncle would have been there in a heartbeat.

16

undisputed that their deed included the disputed area and that it was recorded for the statutorily required limitations period of twenty-five years.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.028.

> A)      Did Whetstone's testimony that she did not intend to "appropriate" land preclude her adverse possession claim?

The Wilsons urge that Whetstone's testimony that she did not intend to "appropriate" her neighbors' property and that she thought that she owned the disputed area precludes an adverse possession claim because adverse possession cannot be "accidental" or "inadvertent."  The Wilsons rely upon the supreme court's statement in *Ellis* that "[m]ere occupancy of the land without any intention to appropriate it will not support the statute of limitations." 620 S.W.2d at 571 (citation omitted).  We find *Ellis* distinguishable.

In *Ellis*, the Jansings were not claiming adverse possession under a recorded deed but under the ten-year limitations period.  They also had not owned the property that adjoined the disputed area for ten years so they had to rely upon the prior owner of their property to establish their adverse possession claim. *Id*. at 570-71.  The  prior owner testified that, although he "assumed" he owned the disputed area,  he "never claimed or intended to claim any property other than that described in his deed" and that the disputed area was "never fenced" and "entrance onto [the disputed area] was not obstructed."  *Id*.  In that context, the supreme court explained "naked possession unaccompanied with any claim of right will never constitute a bar."  *Id*. at 572.  In contrast, the evidence here showed more than "naked possession" or "mere occupancy."  The evidence showed that the entrance from the Wilsons' side to the disputed area was "obstructed" by a fence until the

17

Wilsons added a gate, the description in the Whetstones' deed included the disputed area within their tract of land, and the Whetstones paid taxes on the disputed area from 1957 forward. *See id.*

We find the supreme court's analysis of the adverse possession claim in *Natural Gas Pipeline* instructive. 124 S.W.3d at 198. In that case, the supreme court, citing and quoting *Calfee,* held that the oil and gas lessees adversely possessed mineral interests despite not being aware that their leases had terminated. *Id.* In reaching its holding, the supreme court rejected a similar argument to the Wilsons' argument that Whetstone did not have the requisite intent to appropriate because she did not intend to take her neighbors' property. The supreme court explained that a belief that one is the "rightful owner" with "actual and visible possession and use" satisfied the statutory requirements for adverse possession and "cannot be defeated by . . . the absence of a realization that there could be other claimants for the land." *Id.* (quoting *Calfee*). Otherwise, the supreme court reasoned:

> the running of limitations is suspended until the record titleholder obtains actual knowledge of what it owns. This is a novel proposition indeed. It would mean, for example, that limitations would be suspended whenever heirs did not realize that they had inherited an interest. That has never been the law in Texas. A record titleholder's ignorance of what it owns does not affect the running of limitations.

*Id.*

Similarly, in *Calfee*, the person claiming by adverse possession "never thought of himself as claiming adversely to anyone for the simple reason that he thought that he was the rightful owner and had no competition for that ownership." 544 S.W.2d at 642. The area in dispute in that case was not included in the possessor's deed, but it was "fenced" with the property that was conveyed to the adverse possessor in the deed. *Id.* at 641. The supreme court held that the

18

possessor's belief that he was the rightful owner "coupled with his actual and visible possession and use" satisfied the statutory requirements of his adverse claim. *Id*. at 642.

Here, from 1957 when Whetstone and her husband purchased their tract of land, the description of their tract of land in their recorded deed included the disputed area, they treated the disputed area in the same way that they treated the rest of their land, and they believed they owned the disputed area and that they "had no competition for that ownership." *See id*. Whetstone testified concerning her intent to "appropriate" the disputed area:

A.  We have not notified anybody that we were appropriating land [the disputed area].

Q.  Did you notify them that you were making some type of hostile claim to their land?

A.  We owned it. Why should we?

Q.  So in terms of when you bought it—is it fair to say, from what you're telling me now, when you bought the property you thought that the fence was the boundary and you acted as if it was the boundary based on that thought?

A.  Yes.

* * *

Q.  Do you intend to claim as yours all of the property on the west bank of Onion Creek?

A.  To the fence, yes.

Q.  Up to the fence?

A.  Yeah.

Q.  You intend to claim that as your own?

A.  Yes.

* * *

Q.      For how long have you intended to claim that as your own?

A.      Since we bought it.

* * *

Q.      . . . We're talking about a fence that runs along the west bank of Onion Creek.

A.      Yes.

Q.      Everything on the east side of that, have you—in the 50 years that you've owned your property have you claimed that as your property?

A.      Yes.

Q.      To the exclusion of everybody else?

A.      Yes.

Q.      You haven't agreed to share it with anybody?

A.      No.

We conclude that Whetstone's testimony that she did not intend to "appropriate" land did not foreclose her adverse possession claim of the disputed area. *See Natural Gas Pipeline*, 124 S.W.3d at 198.

> B)      *Did Whetstone's evidence of acquiescence preclude her adverse possession claim?*

The Wilsons also contend that Whetstone's claim and proof of acquiescence was fatal to her adverse possession claim because acquiescence by the parties to the boundary line was mutually exclusive with her claim being hostile. Even if we assume that the claims are mutually exclusive,

20

however, the law allows a claimant to plead conflicting alternative theories, and the jury may choose the theory that it believes based upon its resolution of the conflicting evidence. *See* Tex. R. Civ. P. 48; *Low v. Henry*, 221 S.W.3d 609, 615 (Tex. 2007); *City of Keller*, 168 S.W.3d at 819-20. Here, the jury resolved the conflicting evidence to find that the owners of the property on both sides of the disputed area did not agree or acquiesce to the boundary line as proposed by Whetstone but that Whetstone had adversely possessed the disputed area.

> C)    Did evidence contrary to the jury's finding preclude Whetstone's adverse possession claim?

The Wilsons further point to evidence that (i) Whetstone did not exclusively use the disputed area including Wehrmann's testimony that she used the disputed area when she visited her mother-in-law who was a predecessor in interest to the Wilsons[9]; (ii) Whetstone's testimony that the

---

[9]    Even if the jury believed Wehrmann's testimony, Whetstone could still satisfy the twenty-five year limitations period between the period 1973 to 2004, a thirty-one year period. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.028. Wehrmann testified that her mother-in-law's land was sold shortly after she died in 1973.

The Wilsons also point to a letter that was reviewed by Whetstone's title expert and Whetstone's testimony concerning Mr. Nations's actions diverting water from Onion Creek to form a pond on his tract of land. The letter, however, was admitted subject to a limiting instruction and not "to prove the truth of the matter asserted." Tex. R. Evid. 801(d). Further, the Wilsons inaccurately characterize Whetstone's testimony concerning Mr. Nations's actions. For example, the Wilsons state that Whetstone testified that she and her husband did not advise Mr. Nations that they claimed ownership in the creek. But, Whetstone testified:

Q.    (BY THE COURT)  Did y'all ever have occasion to tell Mr. Nations that he did not own any property on your side of that fence?

A.    Yes.

Q.    When did that happen?

fence was in place when she and her husband bought the property and that she did not know who built the fence, when it was built, or why it was built; and (iii) the lack of testimony that the Whetstones built anything on the disputed area or posted no trespass signs. Given this evidence, the Wilsons contend that Whetstone's use was not exclusive and that the fence was a "casual fence" that does not support "actual and visible appropriation." *See Tran*, 213 S.W.3d at 914 ("Joint use is not enough."); *Rhodes*, 802 S.W.2d at 646 (discussion of "'casual fences' and fences that 'designedly enclose' an area"). They also urge that using the disputed area to graze livestock and occasionally for recreational use, such as swimming, fishing, or canoeing, was not enough to show actual or visible appropriation or hostile use. *See McDonnald v. Weinacht*, 465 S.W.2d 136, 141-42 (Tex. 1971) ("It is accordingly well settled that the mere grazing of land incidentally enclosed as a result of the construction of fences built for another purpose does not constitute possession that will ripen into title by limitation."); *Vaughan v. Anderson*, 495 S.W.2d 327, 332 (Tex. Civ. App.—Texarkana 1973, writ ref'd n.r.e.) ("Our courts have uniformly held that sporadic, irregular and occasional use of land does not satisfy the statutes."). The Wilsons further discount Whetstone's evidence that she and her husband paid taxes on the disputed area from 1957 forward because their tax payments did not specifically identify the disputed area and the Wilsons paid taxes on the disputed area from 2006 forward.

The Wilsons parse the Whetstones' uses of the disputed area. Although a particular use by the Whetstones may not have been enough standing alone to support the jury's

A.     That happened back in 1974.

In any event, it was within the province of the jury to resolve any inconsistencies in her testimony. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (jury can choose to believe one witness over other witnesses or resolve inconsistencies in their testimony).

adverse possession finding, we consider the entirety of the evidence. *See Mead v. RLMC, Inc.*, 225 S.W.3d 710, 716-17 (Tex. App.—Fort Worth 2007, pet. denied) (evidence "taken together" sufficient to create fact issue on adverse possession; requirement of "actual and visible use" satisfied by combination of grazing and other non-grazing activities). We also consider "the nature of the land" at issue. *See Wall v. Carrell*, 894 S.W.2d 788, 800 (Tex. App.—Tyler 1994, writ denied). Here, viewing the evidence in the light most favorable to the jury's findings, the nature of the land was rural, the Whetstones used the disputed area in the same manner as the rest of their ranch, and they paid taxes on the land—which included the disputed area—from 1957 forward. *See City of Keller*, 168 S.W.3d at 807, 822; *Rhodes*, 802 S.W.2d at 645-46 (payment of taxes some evidence of adverse possession); *Carrell*, 894 S.W.2d at 800. Further it was for the jury to resolve conflicts and inconsistencies in the evidence. *See City of Keller*, 168 S.W.3d at 819-20.

We conclude then the evidence was legally sufficient to support the jury's affirmative finding in response to question 6 and the challenged elements of adverse possession. *See id.* at 810; *Bywaters*, 686 S.W.2d at 595; *see also Mead*, 225 S.W.3d at 716-17. Viewing all of the evidence, we also conclude that the evidence was factually sufficient to support the jury's finding and the challenged elements of adverse possession. *Cain*, 709 S.W.2d at 176. We overrule the Wilsons' first and second issues.[10]

---

[10] To the extent the Wilsons complain that the evidence was insufficient to support the jury's finding of adverse possession of property on the west side of the fence, section 16.028(b) of the civil practice and remedies code provides that "[a]dverse possession of any part of the real property held under a recorded deed or other recorded instrument that purports to convey the property extends to and includes all of the property described in the instrument, even though the instrument is void on its face or in fact." *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.028(b); *see also id.* § 16.026(c) (under the ten-year limitations period, "[p]eaceable possession of real property held under a duly

23

***Survey Costs***

In her first issue on cross-appeal, Whetstone argues that the district court erred by awarding one-half of the Wilsons' costs to obtain the survey prepared by Metcalf & Sanders. Whetstone does not challenge the amount of the award but contends that the district court did not have the authority to tax the survey costs.[11] Whetstone also urges that rules 131 and 141 of the rules of civil procedure preclude the award of the survey costs. *See* Tex. R. Civ. P. 131, 141[12]; *Furr's Supermarkets, Inc. v. Bethune*, 53 S.W.3d 375, 376-78 (Tex. 2001) (addressing awards of costs under rules 131 and 141). Whetstone contends that she was the prevailing party and that the district court did not state "good cause" for assessing costs in a manner different from rule 131. We do not reach Whetstone's arguments concerning rules 131 and 141 because our resolution of the district court's authority to award the survey costs is dispositive. See Tex. R. App. P. 47.1.

In their answer and counterclaim for declaratory judgment, the Wilsons allege that they "necessarily incurred reasonable and necessary expenses for the professional services of a surveyor" and that "[a]n award of . . . surveyor fees to the Wilsons would be equitable and just and therefore authorized by Section 37.009 of the [Act] and other statutes and principles of equity." Section 37.009

---

registered deed or other memorandum of title that fixes the boundaries of the possessor's claim extends to the boundaries specified in the instrument"). Here, the Wilsons' expert Sanders plotted the boundary line as described in the Whetstones' deed as falling on the west side of the fence.

[11] The Wilsons submitted an affidavit from Sanders that the cost of the actual work to prepare the survey was $17,219.60 and that amount did not include any expert fees.

[12] Rule 131 provides for the award of costs to the prevailing party and rule 141 only allows courts to assess costs in a manner different from rule 131 "for good cause, to be stated on the record."

provides that, "[i]n any proceeding under this chapter, the court may award costs . . . as are equitable and just." Tex. Civ. Prac. & Rem. Code Ann. § 37.009.

We review the award of relief pursuant to section 37.009 for abuse of discretion. *See Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex. 1985) (decision to grant or deny relief under section 37.009 of the Act within the trial court's discretion). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). Whether a particular expense is permitted by statute or rule to be recoverable as costs, however, is a question of law that we review *de novo*. *See Ferry v. Sackett*, 204 S.W.3d 911, 912 (Tex. App.—Dallas 2006, no pet.); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 31.007(b) (West 2008) (costs may be included in judgment as "may be permitted by these rules and state statutes").

"'Costs' usually refers to fees and charges required by law to be paid to the courts or some of their officers, the amount of which is fixed by statute or the court's rules e.g. filing and service fees." *Sterling Bank v. Willard M, L.L.C.*, 221 S.W.3d 121, 125 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citation omitted). "[C]ase law provides costs are not recoverable unless they are expressly provided for by statute, rule, or under principles of equity." *Ferry*, 204 S.W.3d at 912 (citation omitted). "Generally, in Texas, expenses incurred in prosecuting or defending a lawsuit are not recoverable as costs, unless permitted by a statute or equitable principle." *Sterling Bank*, 221 S.W.3d at 125 (citation omitted).

The district court made the following findings of fact and conclusions of law concerning the survey costs:

25

# I. FINDINGS OF FACT

2. The survey performed by Metcalf & Sanders was used as evidence at the preliminary hearing and the trial by both parties and by the Court.

3. The survey performed by Metcalf & Sanders was used by the Court when it made its ruling finding the boundary line between the properties at issue as a result of the 1917 conveyance.

4. The survey costs by Metcalf & Sanders in the amount of $17,219.60 were reasonable and necessary.

# II. CONCLUSIONS OF LAW

5. Defendants prevailed on the issues of record title, acquiescence, and on the declaratory judgment.

\* \* \*

9. It is equitable and just and there is good cause for the award of one-half of the survey costs to Defendants in the amount of $8,609.80.

Although the district court utilized the survey, including in charging the jury and in the final judgment and both parties sought survey costs, Metcalf & Sanders was not appointed by the court to prepare the survey, and Sanders testified as an expert witness for the Wilsons. *See* Tex. R. Civ. P. 796 (authorizing court to appoint surveyor in trespass to title actions); *Cardenas v. Varner*, 182 S.W.3d 380, 385 (Tex. App.—Amarillo 2005), *affirmed as modified*, 218 S.W.3d 68 (Tex. 2007) (holding that costs of surveyor unilaterally hired by party and not ordered by court not taxable as court costs); *Whitley v. King*, 581 S.W.2d 541, 544 (Tex. Civ. App.—Fort Worth 1979, no writ) (court "without authority" to assess as costs the expenses of a surveyor who was not court-appointed but performed his duties "solely" on plaintiffs' behalf in trespass to try title suit).

The Wilsons cite *Guerra v. Perez & Assocs.*, 885 S.W.2d 531, 533 (Tex. App.—El Paso 1994, no writ), to support the district court's authority to assess survey costs. But, the surveyor in *Guerra* was court-appointed. *Id.* at 532 (court-appointed surveyor filed plea in intervention asking that his costs be assessed against the parties). The Wilsons have failed to provide authority, and we have found none, for awarding the expense of a survey prepared by an expert witness not appointed by the court. *See Ferry*, 204 S.W.3d at 912; *see also Adams v. Stotts,* 667 S.W.2d 798, 801 (Tex. App.—Dallas 1983, no writ) (expert fees necessary to establish evidentiary matters normally are not "costs"); *Griffin v. Carson*, No. 01-08-00340-CV, 2009 Tex. App. LEXIS 3843, at *19 (Tex. App.—Houston [1st Dist.] May 28, 2009, pet. denied) (mem. op.) (citations omitted) ("It is well-settled that, 'regardless of any good cause shown, costs of experts are merely incidental expenses in preparation for trial and not recoverable.'").

On this record, we conclude that the Wilsons' expense to obtain the survey was not recoverable as "costs" under section 37.009 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009. We sustain Whetstone's first issue.

### *Attorney's Fees*

In her second issue on cross-appeal, Whetstone challenges the district court's denial of her request for attorney's fees under the Act. She contends that the district court erred by concluding that attorney's fees were not recoverable for adverse possession and failing to consider awarding her attorney's fees under the Act. She requests that the issue of her attorney's fees be remanded to the district court for reconsideration. Whetstone relies upon sections 37.004(c) and 37.009 of the Act. *See id.* §§ 37.004(c), .009.

Section 37.004 addresses the scope of available relief under the Act. *Id.* § 37.004. Subsection (a) provides that "[a] person interested under a deed . . . may have determined any question of construction or validity arising under the instrument . . . and obtain a declaration of rights, status, or other legal relations thereunder." *Id.* § 37.004(a). Subsection (c) provides: "Notwithstanding Section 22.001, Property Code, a person described by Subsection (a) may obtain a determination under this chapter when the sole issue concerning title to real property is the determination of the proper boundary line between adjoining properties." *See id.* § 37.004(c).[13] Pursuant to section 37.009 of the Act, "the court may award . . . reasonable and necessary attorney's fees as are equitable and just." *See id.* § 37.009. We review the award of attorney's fees under the Act for abuse of discretion. *See Bocquet v. Herring*, 972 S.W.2d 19, 20-21 (Tex. 1998); *Downer*, 701 S.W.2d at 241-42.

As an initial matter, Whetstone contends that the district court erred when it concluded that the "adverse possession [cause of action], in my opinion, is not available for attorney's fees." But the district court was correct concerning Whetstone's statutory adverse possession claims. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 16.025-.028. "Texas has long followed the 'American Rule' prohibiting fee awards unless specifically provided by contract or statute." *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009) (citation omitted). Section 16.034, the section of chapter 16 addressing attorney's fees in adverse possession cases, is not applicable here.

---

[13] Section 22.001 of the property code provides that a "trespass to try title action is the method of determining title to lands, tenements, or other real property." *See* Tex. Prop. Code Ann. § 22.001 (West 2000).

28

*See* Tex. Civ. Prac. & Rem. Code Ann. § 16.034 (West Supp. 2009).[14] That section does not support

an award of attorney's fees to Whetstone, the party in possession and claiming by adverse possession.

*See id.*; *see also Bernal v. Chavez*, 198 S.W.3d 15, 21 (Tex. App.—El Paso 2006, no pet.) (discussing

applicability of section 16.034).

        In any event, the district court considered Whetstone's requests for attorney's fees

under the Act and explained that it was denying both parties' request for attorney's fees because it

did not believe a fee award would be "equitable and just":

---

[14] Section 16.034, titled "Attorney's Fees," provides:

(a)    In a suit for the possession of real property between a person claiming under record title to the property and one claiming by adverse possession, if the prevailing party recovers possession of the property from a person unlawfully in actual possession, the court:

    (1)    shall award costs and reasonable attorney's fees to the prevailing party if the court finds that the person unlawfully in actual possession made a claim of adverse possession that was groundless and made in bad faith; and

    (2)    may award costs and reasonable attorney's fees to the prevailing party in the absence of a finding described by Subdivision (1).

(b)    To recover attorney's fees, the person seeking possession must give the person unlawfully in possession a written demand for that person to vacate the premises. The demand must be given by registered or certified mail at least 10 days before filing the claim for recovery of possession.

(c)    The demand must state that if the person unlawfully in possession does not vacate the premises within 10 days and a claim is filed by the person seeking possession, the court may enter a judgment against the person unlawfully in possession for costs and attorney's fees in an amount determined by the court to be reasonable.

Tex. Civ. Prac. & Rem. Code Ann. § 16.034 (West Supp. 2009).

29

Here's my ruling on attorney's fees. I do believe that the law would allow you—allow me, under my discretion if it's just and right, to award attorney's fees . . . . But if my rulings hold up, which I think they will on the adverse possession, I can't get, under my discretion, to believe that it's equitable and just to award attorney's fees in this case. . . . I'm going to deny them as not being equitable and just when looking at the large picture.

* * *

There were basically four causes of action that were brought. You [Whetstone] ultimately prevailed on the adverse possession. You did not prevail, in my opinion, on the other three causes of action that you brought. . . . The adverse possession, in my opinion, is not available for attorney's fees. As to the other three issues, [Whetstone], with all due respect—and I understand that it's part of the big picture, which is why I'm not awarding any attorney's fees. You did not prevail.

*See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009. The district court considered the "big picture"—that the court had granted a directed verdict that the Wilsons were the record title holders to the disputed area and the primary factual disputes tried to the jury were Whetstone's claims of acquiescence and her statutory adverse possession claims. Even if we assume then that the "sole issue" between the parties was "the determination of the proper boundary line" within the scope of section 37.004(c) of the Act,[15] we cannot conclude that the district court abused its discretion by

---

[15] Given the language of section 37.004 and the district court's declaration that the Wilsons had record title to the disputed area based upon the district court's construction of the relevant deeds, we question whether the "sole issue" was a boundary dispute within the parameters of section 37.004(c). *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.004; *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 25 (Tex. 2003) (when construing a statute, courts begin with the plain language and apply its common meaning); *Lile v. Smith*, 291 S.W.3d 75, 78 (Tex. App.—Texarkana 2009, no pet.) (section 37.004(c) inapplicable to dispute over ownership between two adjoining landowners of "well-defined parcel of land"). The Texarkana court of appeals, faced with the applicability of section 37.004(c), stated the test for determining whether the case is a "boundary dispute": "If there would have been no case but for the question of boundary, then the case is necessarily a boundary case even though it may involve questions of title." *See Lile*, 291 S.W.3d at 78 (quoting *Plumb*

30

denying Whetstone's request for attorney's fees. *See id.* §§ 37.004(c), .009; *Bocquet*, 972 S.W.2d at 20-21. We overrule Whetstone's second issue.

## CONCLUSION

Having considering the parties' various issues on appeal, we affirm the district court's judgment declaring that Whetstone recover title and possession from the Wilsons of the disputed area, declaring the boundary line between the parties' adjoining tracts of land, and denying both parties' requests for attorney's fees. Because we conclude that the Wilsons' survey costs were not recoverable, we modify the judgment to delete the award of survey costs to the Wilsons.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Henson

Modified and, as Modified, Affirmed

Filed: April 20, 2010

---

*v. Stuessy*, 617 S.W.2d 667, 669 (Tex. 1981)).